## WESTERN UNION TELEGRAPH CO., v. BROOKS. (No. 8278.)

(Court of Civil Appeals of Texas. Dallas. Jan. 31, 1920. Rehearing Denied May 8, 1920.)

1. **Damages ⚖=49—Telegraphs and telephones ⚖=68(1)—Mental suffering damages recoverable.**

Injury to the feelings, sensibilities, or emotions, caused by the negligence or fault of another, constitute actual damages for which recovery may be had, and the rule applies to telegraph companies the same as to others.

2. **Telegraphs and telephones ⚖=68(1)—Mental suffering must be contemplated by parties.**

To authorize recovery for mental suffering, the injury must naturally follow the negligent act, and be obviously contemplated by the parties, so that to render a telegraph company liable for mental distress, resulting from negligent failure to transfer money by telegram, it must be shown that the company was informed of the circumstances which would render mental suffering probable in the event of negligence in transmission.

3. **Telegraphs and telephones ⚖=68(1)—Company held to have information of probable mental suffering.**

Where plaintiff's mother informed the telegraph company, when she delivered money for transmission to plaintiff, that he had just escaped from an insane asylum, and the money was to enable him to return home, that he was poorly clothed and unable to work and could not secure employment, the telegraph company had sufficient information to render it liable for mental suffering of plaintiff caused by its negligent failure to deliver the money.

4. **Telegraphs and telephones ⚖=53—Nondelivery of telegraphed money held proximate cause of mental suffering.**

Where a telegraph company negligently failed to deliver money transmitted to plaintiff to enable him to return home by train, and plaintiff, being destitute and unable to work, made his way home on foot with occasional rides, the negligence of, the company, and not the attempt to return home on foot, was the proximate cause of plaintiff's mental suffering during the journey.

5. **Parties ⚖=84(6)—Exception that court has no jurisdiction over "subject-matter" does not raise nonjoinder of necessary plaintiff.**

The "subject-matter" with reference to the court's jurisdiction concerns its power to hear and determine cases of the general class to which the proceedings belong, so that a special exception that the petition shows that the court has no jurisdiction of the subject-matter does not present the objection of nonjoinder of a necessary plaintiff.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Subject-Matter.]

Appeal from District Court, Hunt County; A. P. Dohoney, Judge.

Action by Richard T. Brooks against the Western Union Telegraph Company. Judgment for plaintiff, and defendant appeals. Affirmed.

W. H. Flippen, of Dallas, and Neyland & Neyland, of Greenville, for appellant.

B. Q. Evans, of Greenville, for appellee.

RASBURY, J. This is an appeal from the judgment of the court below, entered upon general verdict of jury, awarding appellee $400 damages for appellent's negligence in failing to promptly transfer and deliver to appellee a sum of money intended to cover the cost of railway transportation for appellee from Bastrop to Greenville and his physical wants and necessities en route.

The facts immediately to be recited are, in substance, those proven on trial. Appellee escaped from the asylum for the insane in San Antonio. He was apprehended by Deputy Sheriff Sims, of Bastrop county, at the town of Bastrop, and placed in the county jail. The authorities in charge of the asylum, in answer to communications from the sheriff,

advised him that appellee's return was not desired, for the reason that he had been convicted under a law declared unconstitutional, furnishing the sheriff at the time the address of appellee's mother. Appellee wrote his mother, Mrs. N. C. Brooks, of Caviness, that he had escaped from the asylum and was in jail in Bastrop. She communicated with the sheriff concerning appellee, and was told by the sheriff that he was there, and would be released upon receipt of $10 with which to defray his expenses home. In turn she wrote the sheriff to hold appellee, and she would send the money as quickly as she could obtain same. She obtained the money and went to Paris, from which place she wired the sheriff, inquiring if appellee was there, to which the sheriff replied that he was, and to wire him money to "come home on." She then went to appellant's agent in Paris, and delivered him $15 to be transferred to appellee at Bastrop, together with the tolls demanded by appellant for such service. The transaction occurred at about 4 o'clock p. m. on September 14, 1917. At the time the money was deposited with appellant and its transfer arranged Mrs. Brooks explained to the agent, as reasons why the money should be promptly transferred and delivered, that appellee had escaped from the asylum for the insane; that the authorities refused to accept his return because improperly tried and convicted; that he was feeble, without money, and in a drouth-stricken country, where there was no work to do if he was able to do it, was "in a pitiful condition of health and mind," among strangers, not competent to take care of himself, without money or clothes, and that if he did not receive the money she did not know where he would go, whether he would start home, or what would become of him. The agent advised Mrs. Brooks that appellee would receive the funds that evening, and for her to meet the train the next night. Appellee read the telegram from his mother, inquiring if he was in Bastrop, and knew she intended to furnish him money to defray his expenses home. As a consequence he remained in Bastrop until midnight of the night of the 17th, calling three or four times each day at appellant's office to ascertain if the money had arrived, and explaining to those in charge that he was anxious about it for the reason that he was without money to return home, or buy food, and that his clothes were "torn off." Failing to receive the money, appellee abandoned hope that his mother would send it, and, as indicated, left Bastrop about midnight of September 17th for the purpose of making his way home the best he could. He "hoofed" it through the country five or six miles until his feet became sore and blistered, to relieve which he tore up his coat and covered his feet in that manner, finally boarding a freight train until he reached Waco. At the time he left Bastrop he was ill, despondent,

221 S.W.—65

and weak, and so poorly clad that he was ashamed to seek employment. He was without food from Bastrop to Hillsboro. In Waco he secured a position as dishwasher, but was able to hold the place only two or three days, when he quit and started home again. With the money earned in Waco he purchased a shirt and a pair of tennis shoes. From Waco to Hillsboro he walked part of the way, and part of the way he rode in a wagon with a farmer. From Hillsboro to Roxton he "tramped" it afoot, save from Garland, at which point he rode an automobile. Roxton is about 25 miles from Caviness. From Waco north he was at times without food for a period of 48 hours. Because his clothes were not in condition for women to see he was ashamed to present himself at residences and ask for food. On account of exposure and fatigue he suffered physically and mentally in his journey from Bastrop to Roxton, and was greatly despondent. He remained at Roxton a week, and then went home, arriving there October 7th, a total distance from Bastrop of approximately 200 miles. The first transfer of the money by the Paris office of appellant to the Bastrop office was received September 19th, 6:45 p. m. This transfer seems to have been made when it was discovered that the original transfer or telegram had never been forwarded from Paris. The explanation at trial was that it had been lost.

By special exception directed against the allegations of the petition, which reflect the facts recited, and by requested peremptory instruction, the one being overruled and the other refused, the appellant urges here, as it did in the court below, the contention that damages for mental distress alleged to have resulted from the failure to deliver money by telegraph are not recoverable.

[1] Injury to the feelings, sensibilities, or emotions, caused by the negligence or fault of another, constitute, of course, actual damages for which recovery may be had. The rule applies to telegraph companies in the same manner that it applies to other companies, corporations, or persons. So Relle v. Western Tel. Co., 55 Tex. 308, 40 Am. Rep. 805.

[2] In some instances such damages arise as matter of law when the negligence is shown, as where the injury naturally follows the negligent act and were obviously contemplated by the parties. In cases like the one at bar, that is, to recover damages for injuries to the feelings, sensibilities, or emotions, commonly designated as mental distress, resulting from the negligent failure to transfer money by telegraph, it must be shown that the telegraph company was informed at the time it agreed to make the transfer of the conditions and circumstances of the beneficiary which rendered prompt performance of more than ordinary importance, and as a result contemplated the consequences that would follow the negligent breach of the contract.

Western Union Tel. Co. v. Simpson, 73 Tex. 422, 11 S. W. 385. What we have said is the substance of the holding in the case cited, and while numerous other cases discuss the rule, applying it in some cases and refusing to apply it in others, because the facts in the particular case did not authorize it, none, as we understand them, depart from the rule.

[3] The inquiry, in the light of the rule recited and the contention of appellant, then, is, Was appellant informed, at the time it contracted to transfer the money to appellee at Bastrop, that appellee's condition and circumstances were such as to render prompt transfer of the money of more than ordinary importance? We think so. It was informed that appellee had escaped from an asylum for the insane, that he was among strangers in a "pitiful" state of health and mind, feeble, and not only not able to work, but in a country where employment could; not be secured, not competent to take care of himself and without money, and that unless he secured the funds deposited with appellant it was difficult to approximate what he would do, whether he would start home or what would become of him. Obviously the facts disclose a case out of the ordinary, and were sufficient, in our opinion, to put the appellant upon notice of the necessity for prompt action, as well as the probable serious consequences which would follow failure to promptly transfer the money.

In various ways appellant presents here, as it did in the court below, in substance, the contention that it was never anticipated by the parties that appellee would leave Bastrop as he did on failure to receive the money, and that as a consequence the appellant is not liable for the mental distress thereby resulting. We are unable to agree with the contention. Appellant was informed that appellee had escaped from the asylum for the insane at San Antonio, and similarly made his way from that point to Bastrop in an attempt to reach home. It knew that the money was being sent him for the purpose of defraying his transportation home. It knew that he was among strangers without money, and unable to secure employment, or to perform it if he had it. It knew that he was in a distressed state of mind, and was warned by appellee's mother in effect that he might start home—in fact the inference is to be drawn from her testimony that she feared that he might do something more serious, since she said she did not know what he might undertake. In fact we hardly see what else was to be anticipated concerning what appellee would probably do if he failed to receive the money other than that he would do what he actually did do.

[4] Several assignments form the basis for the contention that the failure of appellant to transfer and deliver the money to appellee did not proximately cause the injuries to appellee, but that his voluntary act in leaving Bastrop was the proximate cause. We believe not. Leaving Bastrop was the effect of the negligence, the event brought about by the failure to deliver the money, and which would not have been necessary but for the negligence. By the failure to deliver the money appellee was caused to depart. In other words, failure to deliver the money was that which was nearest in the order of responsible causation, the proximate cause.

[5] Among other special exceptions directed against appellee's petition was one reciting, "It appears that the court has no jurisdiction of the subject-matter of this suit." Appellant contends on appeal that there was a nonjoinder of parties; that is to say, that appellee, his mother and appellant were joint parties to the contract to deliver the money, and that all should have been parties to any suit on the contract. The court's action in overruling the special exception is used as basis or authority for the issue. In our opinion the exception did not raise the issue presented, in fact counsel for appellee objects on that ground to any consideration of that issue. Subject-matter in reference to courts concerns the power of the court "to hear and determine cases of the general class to which the proceedings in question belong; the power to deal with the general subject involved in the action." 15 C. J. 734. The subject-matter of the case at bar, as disclosed by the petition, is to recover $3,000 in compensation of alleged mental distress resulting from the negligence of appellant; the power to hear and determine which the trial court obviously had jurisdiction. Nonjoinder of necessary parties is a matter apart from the subject-matter of the suit, and cannot, of course, be presented under exception challenging the court's jurisdiction.

Finding no reversible error in the record, the judgment is affirmed.